## MONTANA EASTERN PIPE LINE CO. v. MONTANA DAKOTA UTILITIES CO.
### No. 2953.

District Court, D. Montana.
Sept. 15, 1938.

Fred G. Huntington, of Billings, Mont., Loud & Choate, of Miles City, Mont., and Wood & Cooke, of Billings, Mont., for plaintiff.

Hildebrand & Warren, of Glendive, Mont., and John C. Benson and Loring M. Staples, both of Minneapolis, Minn., for defendant.

PRAY, District Judge.

The complaint herein shows that plaintiff is a Montana corporation with principal place of business at Billings, Montana, and that defendant is a Delaware corporation doing business in Fallon County, Montana, and elsewhere, and is a common carrier of natural gas, and owns a pipe line extending from the Baker-Glendive gas field, in Fallon County, to Rapid City, South Dakota, Miles City, Montana, Bowman, North Dakota and Glendive, Montana; that defendant is engaged in the business of transporting natural gas through its pipe line and distributing it for domestic, industrial and other purposes. That in the year 1927 the defendant, or its predecessor in interest, filed applications with the Secretary of the Interior for a right-of-way according to Section 28 of the Act of Congress approved February 25, 1920, 41 Stat. 437, 449, 30 U.S.C.A. § 185, and for several years has made use of it subject to the terms of said Act, which provides among other things that the pipe-line shall be operated as a common carrier; that it is the duty of the defendant under the said Act to accept and transport gas in the vicinity of its pipe-line and gathering branches according to the Act aforesaid and in pursuance of the stipulations and requirements of the Secretary of the Interior relating to the appropriation of public land and defendant's pipe-line right-of-way. That plaintiff acquired by assignment an oil and gas prospecting permit, known as the Oler permit, Billings, Montana, serial 028736; that plaintiff owns the sole and exclusive right to produce and sell oil and gas from said permit, and from a producing gas well which is situated thereon, and that plaintiff is the owner thereof and entitled to market said gas. That plaintiff also acquired the sole and exclusive right to produce and market gas from land known as the Findlater tract where there is a producing well; and the same may be said respecting the Armstrong tract containing a producing well; also the permit known as the Billings Consolidated, 027-575-027644-028795, consisting of 2,025 acres, containing four producing natural gas wells; also the owner of that certain permit known as Billings Serial 028643, containing a producing gas well; that most of these tracts or permits are adjacent to or near defendant's pipe-line. That prior to the commencement of this action plaintiff had entered into contracts with many responsible persons, firms and corporations near Rapid City and Deadwood, So. Dakota, and elsewhere, for delivery of natural gas, and that under such contracts plaintiff is obligated to commence delivery of gas upon various dates between August 15th and September 15th, 1933; plaintiff also held agreements to furnish gas to Fort Meade and the Indian school power plant at Rapid City. But in order to furnish these prospective buyers with gas it would be necessary to use defendant's pipe-line and gathering lines in the vicinity of some of plaintiff's wells. Plaintiff demanded that defendant transport its gas through the pipe-line but the latter neglected or ignored such demands and offered groundless excuses and subterfuges to justify its failure to transport the gas; that plaintiff furnished all necessary information to defendant and was at all times "ready, able and willing to pay the usual, customary and reasonable charges for such transportation;" but that defendant still fails and neglects to transport plaintiff's gas, or permit plaintiff to connect with defendant's pipe-line; that defendant has neglected to fix or establish any rate or tariff for transportation of gas; that plaintiff has suffered irreparable injury and therefore seeks injunctive relief; that defendant takes its supply of gas from sundry wells in the Baker-Glendive field and is draining the gas from plaintiff's wells heretofore mentioned to an extent aggregating at least fifty million cubic feet of gas monthly; that plaintiff is obliged to pay the govern-

ment compensatory royalties amounting to $500 per month, and alleges a further damage aggregating $3,500 by reason of compensatory royalties as a direct result of the acts of defendant. Plaintiff concludes with an application for injunction pendente lite, which appears never to have been issued.

The defendant admits that it is a public utility, owns the pipe-line in question, which traverses lands of the United States, and supplies gas to various communities including Rapid City and other places, but does not own pipe-lines extending from Baker-Glendive field to Miles City, to Bowman or to Glendive; that it filed applications for right-of-way over such lands with the Secretary of the Interior pursuant to the statute referred to by plaintiff; that it has operated such pipe-line in accordance with said statute and subject to its terms and conditions; admits its duty to transport gas through its pipe-line as a common carrier, under the statute as it applies to defendant's pipe-line, and pursuant to such reasonable stipulations and requirements as the Secretary may lawfully prescribe, and that it is willing to perform its duties accordingly; admits there is a producing well on lands described in paragraph VI, one in VII and one in VIII, as set forth in the complaint, but denies other matter in said paragraphs, and alleges as to the gas well in VII that the pressure within its pipe-line in the vicinity of this well is greatly in excess of the pressure in said well, and that such gas can not be taken into defendant's pipe-line without pumping and compression; admits the existence of five gas wells in paragraph IX of complaint and denies the other matters therein; alleges it is informed and believes there are disputes and controversies between plaintiff and others as to the former's alleged right to produce and market gas from any of the wells above referred to, and that plaintiff's rights are so doubtful that it is not entitled to the relief sought; admits the government awarded plaintiff a contract to supply gas to Fort Meade, but denies the pipe-line connecting this fort with defendant's main pipe-line is the property of the government; denies the matters alleged in reference to the Rapid City Indian School, or that the school has installed a connecting pipe line from it, or the power plant belonging thereto, to defendant's main pipe-line; admits there is no other than defendant's pipe-line extending from Baker to points referred to in South Dakota, but says that defendant does not own any pipe-line near or in vicinity of any of the properties described in paragraph XIII of the complaint, except the SE¼ of the SE¼, Sec. 13, T. 7, North, Range 59 East, and does not own the pipe-line to which the well on this property is connected; says that gas in any of the wells could not be taken into defendant's pipe-line without compression; admits plaintiff made demands for transportation of gas but that they were arbitrarily made, that in all instances such demands were for the transportation of gas through lines which defendant does not own and for delivery through distributing systems which plaintiff has no right to use; that defendant has not ignored such demands, but that delays occurred because of plaintiff's failure to furnish defendant with necessary information to fix rates; that certain necessary information has never been furnished defendant although it has quoted plaintiff a reasonable rate at which it would transport gas from Baker to the Black Hills through its pipe-line, and says that no gas has been offered for transportation under the rates quoted; alleges there is no usual or customary charge such as plaintiff has demanded; denies the allegations of paragraphs XIV, XV and XVI of the complaint; denies that plaintiff has suffered or will suffer great or irreparable injury; that the injuries are not as extensive as alleged, and denies that they were caused by defendant. Thereafter follows in paragraph XVIII of the answer a lengthy history of the development of the gas field in question and the activities of both parties to the action, as well as the predecessor of plaintiff, showing that whatever injuries plaintiff has sustained, if any, were caused by its own conduct and that of its predecessors in interest; that no demands were made upon defendant to transport gas until after plaintiff had failed in the promotion of an additional pipe-line from said gas field; that thereafter plaintiff engaged in a course of unfair competition as set forth in paragraph XIX of the answer; defendant claims that it is ready, able and willing to transport gas owned by the plaintiff from Baker to the Black Hills, over its said pipe-line, subject to the terms and conditions prescribed by it.

Defendant then alleges that the Atlantic-Pacific Oil Company of Montana, a corporation, claims to be the owner of that certain oil and gas prospecting permit described in paragraph IX of the complaint known as Billings Consolidated 027575–027-

644-028795, containing four producing gas wells; that this company also claims to be the owner of that certain oil and gas prospecting permit in the same paragraph known as Billings Serial 028643 and of the gas well located thereon; this oil company claims that it is entitled to produce and market gas from each and all of said wells, and that plaintiff is not entitled to produce or market any gas whatsoever from said wells. Defendant alleges that it has no interest in the controversy between the plaintiff and said Atlantic-Pacific Oil Company as to the ownership of said wells or the right to produce and market gas therefrom, and that if it should be required to transport such gas over said pipe-line it would be immaterial whether such service was rendered for the Atlantic-Pacific Company or for the plaintiff. However, there seems to be no further question as to which one of the parties has the right to produce and market gas from the wells just described, since the decision of the Supreme Court of Montana rendered in the suit of said Atlantic Pacific Oil Company v. Gas Development Company, et al., 105 Mont. 1, 69 P.2d 750, in affirming the decision of the lower court, awarding such rights to the plaintiff, said Atlantic-Pacific Oil Company. This case, bearing docket number 7556, was decided at the March term, 1937, and appears to have included Billings Consolidated Permit No. 027575, which formerly included Wood Permit, Billings 027575; the Daly Permit, Billings 027531; the Scott Permit, Billings 027644 and Teters Permit, Billings 028795.

On May 25th, 1937, the same Supreme Court, in Atlantic Pacific Oil Co. v. Montana Eastern Pipe Line Co., Mont., 69 P. 2d 763, the companion suit to No. 7556 above, affirmed the judgment of the District Court for the reasons given in the opinion rendered in No. 7556; this case involved the Talmadge Permit, Billings 027643. Plaintiff by consent of court added to its complaint a supplemental paragraph relating to a hearing before the Secretary of the Interior involving in particular the tariff rate first submitted by defendant to plaintiff for transportation of gas through its pipe-line, in which the Secretary held the rate unreasonable and confiscatory, which plaintiff claims is res adjudicata, so far as that particular tariff rate is concerned. The defendant asserts that the order made by the Secretary at this hearing was void, since the Department of the Interior had no jurisdiction over said rates, or any authority to consider or adjudicate them; that this proceeding is still pending, and a motion for rehearing granted by said Department of the Interior; that said order is not final, binding or material in the instant case; that this proceeding purported to be conducted under the provisions of the Federal Oil and Gas Leasing Act, 41 Stat. 449, prior to its amendment which occurred August 21st, 1935, 49 Stat. 678, 30 U.S.C.A. § 185; that according to said act, as amended, defendant is now purchasing, without discrimination, all natural gas produced from government lands in the vicinity of defendant's pipe-line, including all natural gas which plaintiff in its complaint is seeking to compel defendant to transport, in such proportionate amounts as have been determined by the Secretary of the Interior to be reasonable; that in said proceeding a certain tariff and schedule of rates, rules and regulations for transportation of gas through defendant's pipe-line were involved, which had been promulgated by defendant sometime prior to said proceeding and hearing; that subsequent to said hearing and on March 3rd, 1937, defendant promulgated and delivered to plaintiff an alternative tariff, schedule of charges, and rules and regulations for transportation of natural gas through said pipe-line. Plaintiff alleges that the present rates quoted by defendant are unreasonable, and that the purpose of this action is to enforce the contract obligation of defendant, and have the court fix a rate that is reasonable and non-discriminatory; that this is not a rate hearing in any sense; that the court must determine what the service is reasonably worth regardless of any question of return to the defendant.

So many things have been touched upon in the testimony and argued in the briefs of counsel—interesting to read although interminable in length—that the court considers unnecessary to a decision in this case, that they will be omitted altogether in some instances and but briefly referred to in others. The court has considered the testimony in this case; has weighed it with care, bearing in mind at the same time, the appearance of the witnesses, their experience or lack of experience, their manner of testifying, their knowledge or lack of knowledge, their means of knowing the things about which they gave testimony, their interest or lack

of interest, bias or prejudice, and other things that the court usually observes during the progress of a trial, and is of the opinion that if the plaintiff still has gas to transport and customers to buy in the Black Hills that the defendant will have to transport it, and that plaintiff will have to pay the rate so fixed unless and until the higher courts shall relieve it of that obligation. This court would undoubtedly have authority to say whether a rate is reasonable or unreasonable, and that seems to be the principal question in the case that presents a serious problem. The defendant has taken the position that this is merely a moot case, that the plaintiff has no gas to sell, no need of transportation facilities and no customers to buy. Undeniably he had contracts for the purchase of gas by customers in South Dakota, and some of them may still be valid, or were at the time of giving his testimony; he, the manager of plaintiff, said they had been renewed for periods of three to six years, and could be extended to ten years. It also appears that he has a right to take gas from at least one source—the Armstrong lease. Thus far there is no doubt in the court's mind as to the existence of these facts, or the further fact, that the defendant is bound by contract to transport this gas through its pipe-line, unless it can successfully bargain with plaintiff for the purchase of its gas. If plaintiff secured customers in the Black Hills by under-bidding the pipe-line company, of course, it would necessarily require a low rate for transportation in order to realize a profit, but, admittedly, it would be unfair to require any lower rate than the company could stand under the tests that are applicable, although the plaintiff should thereby lose his customers. It does not appear that plaintiff has much gas to transport as nearly all of it is tied up in a unit agreement. There was a stipulation entered into between counsel and, for some reason, the fact of these unit agreements being in force was not to be touched upon in this case; however, plaintiff referred to them and so they were brought to light and discussed. It seems to the court that it would be quite important to know whether the permits and leases claimed by plaintiff are really under his control or tied up in a unit agreement; if the defendant had control of all the gas then we should not be required to waste any time on what would appear to be a moot case. But it seems of no consequence here to determine whether the Secretary of the Interior had authority to fix, or pass on, gas rates; the first tariff submitted to him and by him declared to be unreasonable was superseded by another tariff offered to plaintiff sometime before the beginning of the trial in this case, and this particular tariff seems to be the one that should be considered by the court.

The evidence discloses that plaintiff has never attempted to bargain with defendant for the sale of its gas or has ever attempted to transport any gas through defendant's pipe-line under either tariff offered it. It does seem that unless the tariff now before the court is so manifestly unreasonable as to amount to a refusal to accept any gas for shipment, that plaintiff should have made an attempt, at least, to test the rates; after having done so, it might then have been able to present more convincing proof of the unreasonableness of the tariffs offered than now appears in the record. There seems to be no doubt that both statutes referred to should be considered in determining this case, and in respect to the alternative requirement of transportation or purchase, if the plaintiff had gas for sale and transportation, would it not have been a sensible and businesslike move under the circumstances, for plaintiff to have made some attempt to bargain with defendant for the purchase or transportation of the former's gas, then upon refusal or the imposition of unreasonable or impossible conditions, plaintiff would then have been in a much better position to assert and perhaps establish such an unreasonable and arbitrary course of conduct towards plaintiff as might have been considered tantamount to a refusal to do business with plaintiff in any event, or under either alternative plan. But neither course was pursued, consequently plaintiff was not able to show from its own experience in dealing with defendant that either tariff was incapable of adjustment to its requirements or was unreasonable. A trial of the rates fixed by defendant might have resulted in dissatisfaction on the part of plaintiff, but also it might have furnished some very definite proof as to the fairness of the rates.

▮▮ The pertinent language of the stipulation or agreement relied upon by plaintiff and by it referred to reads as follows: "and further expressly consents and agrees to purchase and/or transport oil or gas available on government land in the vicinity of its pipe-line or gathering branches

without discrimination as between government lands and lands of others, and in such ratable proportions as may be satisfactory to the Secretary of the Interior." If plaintiff should not be satisfied with the result in this case, it would very likely have available another proceeding before the Secretary of the Interior under the later statute, perhaps it should have gone there in the first place, before coming to this court, although this court is satisfied that it had the right to come here under the statute then in force and to conclude its case. It seems to be an accepted principle by the courts generally that a public utility may not be compelled to operate at a loss, and that where a statute or public service commission holds contrary to this principle and fixes a rate that is confiscatory the courts may set it aside. In the present case apparently there is no statute and no commission authorized to fix rates here in dispute, but undoubtedly the same principles should apply. The claim of defendant in this respect is, that plaintiff is asking the court to fix a rate to suit its convenience, and also one that is confiscatory and bears no relation to the cost of transportation or to a reasonable return on defendant's investment. Many cases have been cited which illustrate the principles involved, although the question here concerns only the reasonableness of the rate, and not whether confiscatory. McCardle v. Indianapolis Water Co., 272 U.S. 400, 47 S.Ct. 144, 71 L.Ed. 316; Great Falls Gas Co. v. Public Service Commission, D.C., 34 F.2d 297.

The extent of the court's authority in this case seems to be to determine whether the rates offered are reasonable. The presumption here is that the defendant has acted in good faith in offering its rates, and the burden is on the plaintiff to show that such rates are unreasonable. To quote briefly from the Montana Public Service Commission in Benjamin v. G. N. Utilities Co., 17 M.U.R. 487, P.U.R.1924-B 705, 708, which seems to apply to some extent here: "Following submission of the proposal and after preliminary investigation, the commission approved the rates for a trial period. In this instance, as in all others where the statement of a rate is a pure prediction because of the utter absence of an empirical standard, the commission has followed the practice of relying, to a large extent, upon the judgment of those who are responsible for the enterprise. They are possessed of the known factors that may be utilized in formulating a schedule of rates, and are better qualified than the commission, at that stage of the business to deal with the necessities of the situation. We do not mean to convey the impression that there is no check on the initial proposal for rates. The contrary is the fact, and the commission makes the best preliminary determination that it can, but the commission, under the American system of regulation, may never rightfully assume managerial functions." The situation described there is not unlike that in the present case. Defendant claims, and there is some ground for its contention, that there is no real basis upon which a rate can be computed here; no experience in operating the pipeline as a common carrier, and the amount of gas which will be transported can not be ascertained in advance, so they say, the setting of rates under such circumstances is a question primarily for the management, until experience and operation have set up rate standards whereby reasonable rates can be fixed; but the ascertainment and promulgation of such rates is subject to control by the commission. Idaho Power Co. v. Thompson, D.C., 19 F.2d 547, 579.

Can this court hold that plaintiff, through its manager Wight, has sustained the burden of proof when he admitted that he did not know of a single pipe-line in the United States that makes a tariff for transporting gas; as an expert witness he testified that the proposed rates were unreasonable and that a charge of five cents per 100 miles would be reasonable and that defendant could still make a reasonable return on its investment. The court is not going to review the voluminous testimony of the witness Wight or the witness Davis, testifying on behalf of defendant, but having heard it at the trial and having read it in the transcript there is no question in the court's mind as to the superiority of the latter's experience and knowledge over that of the former. The latest tariff offered by defendant to plaintiff is doubtless the one upon which the court should rest its decision, although both tariffs have been declared by the defendant's witnesses to be fair and reasonable.

As the court has before intimated the plaintiff has not sustained the burden of proof; on the other hand the witness Davis appeared to be fair and disinterested throughout and his testimony seems to the court to be clear and convincing; it is

therefore undoubtedly the duty of the court to hold that the tariff rates in question are reasonable, and such is the decision herein, with costs of suit in favor of defendant.

What the court has said above concerning this case may be considered as the findings and conclusions of the court, to satisfy the rule,' and both sides are allowed an exception to all matters herein and also in respect to any questions not decided by the court which counsel may believe should have been decided.